

MARITZA D. BRASWELL
MBRASWELL@JONESKELLER.COM

August 22, 2014

*Via Electronic Mail and First Class Mail*

Sean G. Deverin, Esq.
160 White Road, Suite 204
Little Silver, New Jersey 07739
Deverin75@aol.com

Re:   *Channel Methods Partners, LLC v. Pharmatech, Inc.*
      *Superior Court of New Jersey*
      *Monmouth County, Law Division*
      *Docket No. MON-L-2857-14*

Dear Mr. Deverin:

I am writing on behalf of my client, Pharmatech, Inc. ("Pharmatech") concerning the above-captioned case. We have reviewed the Complaint and I write to address certain key issues at the outset. Please let me know when you are available to discuss.

### I.   CMP's breach of contract claims are unfounded

The contract between Pharmatech and Channel Methods Partners, LLC ("CMP"), a copy of which is attached hereto (henceforth, "Contract"), includes a clause that states the following:

> After month 4 of the engagement, either party may cancel the
> balance of this Letter Agreement by providing fifteen days written
> notice to the other.

Contract at § 8.

On April 7, 2014, approximately ten months after Pharmatech signed the Contract, Pharmatech provided written notice to CMP that it was terminating the Contract. *See* the 4/7/14 letter from Mr. Bohacs, attached hereto. Pharmatech appropriately terminated the Contract and is not in breach thereof.

Additionally, and to the extent CMP alleges breach of contract based on some purported "attempt" to breach the contract, those claims are also without merit since a purported attempt is not an actual breach.

August 22, 2014
Page 2

In short, CMP's breach of contract claims (and any other claims duplicative of the same) are unfounded and should be withdrawn immediately.

### II.   C.R.S. § 13-17-201 calls for the award of attorney fees incurred in the dismissal of a tort claim

Any and all tort claims asserted in the Complaint are barred and their dismissal will result in fee shifting.

The Contract calls for the application of Colorado law to this dispute. Colorado law provides that when a defendant successfully moves for the dismissal of a tort claim prior to trial, "such defendant <u>shall</u> have judgment for his reasonable attorney fees in defending the action." C.R.S. § 13-17-201 (emphasis added). In this matter, all of CMP's tort claims are likely to be dismissed and CMP will be liable for Pharmatech's attorney fees.

The economic loss rule bars a plaintiff from transforming what are truly contract claims into tort claims. "A party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Carder, Inc. v. Cash*, 97 P.3d 174, 183 (Colo. App. 2003); *see also Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). "Economic loss is defined generally as damages other than physical harm to persons or property." *Town of Alma*, 10 P.3d at 1264. A plaintiff must make the mandatory election between breach of contract claims or tort claims "at the outset of a lawsuit." *Id.* at 1263-64 ("We have previously recognized a court's duty to determine, <u>at the outset of a lawsuit</u>, the type of duty that has allegedly been breached") (emphasis added)). Tort claims barred by the economic loss rule are properly dismissed at the outset of a lawsuit through a motion to dismiss. *Id.*; *Van Rees v. Unleaded Software, Inc.*, 2013 WL 6354533 at * 2-4 (Colo. App. 2013) (affirming trial court's dismissal of tort claims, including claims for fraud and negligent misrepresentation, under C.R.C.P. 12(b)(5), pursuant to economic loss rule).

To the extent CMP has any viable claims against Pharmatech (and for the reasons set forth herein, it does not), those claims would be contract claims, not tort claims. The Complaint itself demonstrates that CMP does not allege breach of duties independent from duties imposed by the Contract. Each of CMP's claims are either expressly or impliedly tied to the Contract, such that Pharmatech's contractual duties are the purported bases for each of the tort claims. *See, e.g.*, Complaint at ¶¶18, 19, 25, 26, 30, 38, 41, 43.

Pharmatech intends to move for dismissal of each of those claims on several grounds, including pursuant to the economic loss rule. In the likely event the Court dismisses the tort claims, CMP "shall" be liable for Pharmatech's attorney fees pursuant to C.R.S. § 13-17-201.

JONES&KELLER

August 22, 2014
Page 3

### III. Pharmatech's counterclaims

CMP's failure to substantially perform its obligations under the Contract gives rise to counterclaims by Pharmatech. As described in the Statement of Work appended to the Contract, over the course of one year CMP was obligated to "locate and qualify a minimum of 13-16 Full Service CRO opportunities." As recognized in the Statement of Work, this "works out to an average target of 4 Full Service opportunities each quarter for 4 quarters."

During the ten months that CMP worked on the Contract, CMP presented no more than seven (7) opportunities to Pharmatech, at a rate of approximately two (2) opportunities per quarter. This was not substantial performance of the Contract.

Moreover, it appears CMP's performance was not only quantitatively deficient, but qualitatively deficient as well. Historically, Pharmatech has closed on approximately 48% of the Full Service CRO opportunities presented to it. Of the opportunities presented by CMP to Pharmatech, *none* resulted in actual contracts for Pharmatech. It appears CMP failed to utilize "all commercially reasonable efforts" to present opportunities, despite its obligation to do so as described in the Statement of Work. CMP's failures in these regards constitute CMP's own breach of contract, and Pharmatech's termination was an appropriate effort to mitigate damages.

Separate and apart from the respective duties set forth in the Contract, Pharmatech detrimentally relied on CMP's representations when it forewent hiring its own internal sales team and lost six to seven million dollars in revenue as a result.

### IV. CMP's Improper Filing in New Jersey

Finally, the Contract contains a "Venue" clause requiring that CMP file this case, if at all, in Colorado. To the extent CMP takes the position that the Venue clause is ambiguous, it will be construed against CMP, as the drafter.

\*\*\*

In sum, if CMP continues in its litigation efforts it should expect significant exposure and expenditure as it relates to: (i) the lack of merit associated with CMP's breach of contract (and related) claims, (ii) the likelihood that CMP will have to pay Pharmatech's attorney fees, at least in part, (iii) CMP's own breach of contract and the additional harm inflicted upon Pharmatech, and (iv) CMP's improper filing in New Jersey.

Please dismiss CMP's Complaint immediately.

{JK00285645.1 }

**JONES KELLER**

August 22, 2014
Page 4

                                                Very truly yours,

                                                Maritza D. Braswell
                                                **JONES & KELLER, P.C.**

Enclosures

{JK00285645.1}

**JONES&KELLER**

# Channel Methods Partners, LLC
*Outsourced business development for emerging technology companies*

*Qualified pipeline creation*  
*Outsourced sales teams*

*Outsourced sales management*  
*Branding and messaging campaigns*

---

May 17, 2013

Rob Bohacs, Chief Executive Officer  
Pharmatech, Inc.  
789 Sherman Street, Suite 310  
Denver, CO 80203

Dear Rob,

We are pleased to submit this Letter Agreement for a Channel Methods Partners (CMP) engagement to provide a variety of outsourced services to Pharmatech, Inc. (PHARMATECH) in accordance with the Statement of Work (SOW) attached hereto as Exhibit A. The engagement will be focused on building a pipeline of "Qualified" opportunities for PHARMATECH.

## Contractual and Ancillary Terms of this Letter Agreement

1. Billing and Payment

CMP will invoice in accordance with the monthly resource utilization plan and fixed cost as shown in the SOW. CMP will invoice PHARMATECH fifteen days prior to the start of each monthly period and payment shall be due thirty days after receipt of invoice.

2. Expenses

CMP does not anticipate any billable expenses in fulfillment of this engagement except as described below. Should CMP personnel be required to travel on behalf of PHARMATECH, and with the prior approval of PHARMATECH, CMP will be reimbursed for actual T&E expenses incurred.

3. Incentives

CMP will be entitled to incentive fees in accordance with the SOW. CMP will have the right to conduct semi-annual audits of PHARMATECH customer invoicing to ensure compliance with the Incentive Plan. Any costs to CMP related to an audit will be borne by CMP. Should an audit uncover a discrepancy of greater than 20% between Incentives reported by PHARMATECH and actual commissions due to

1

CMP, then PHARMATECH will be responsible for the expense of the audit in an amount not to exceed $5,000.

4. Project Reviews

CMP will submit weekly sales reports and conduct weekly sales meeting calls with the relevant PHARMATECH executives. It is anticipated that CMP will be working closely with PHARMATECH sales people on specific accounts on a daily basis.

5. Hiring of employees

Both CMP and PHARMATECH agree not to hire any current employees or past employees that have worked on this engagement, of the other for a period of eighteen (18) months after the termination of this Letter Agreement without prior written consent of the other party.

6. Confidentiality & Non-Compete

CMP and PHARMATECH agree to maintain the secrecy of each other's proprietary and confidential information in accordance with the mutual Non-disclosure Agreement already executed by both parties.

7. LIMITATION OF LIABILITY.

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR (A ANY SPECIAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES, INCLUDING ANY LOST PROFITS OR LOST PHARMATECH ARISING OUT OF THE SERVICES PERFORMED HEREUNDER; AND (B) ANY AMOUNTS IN EXCESS OF THE FEES PAID FOR THE SERVICES. THE LIMITATIONS SET FORTH IN THIS SECTION 7.0 SHALL APPLY EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF WHETHER ANY REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE FEES FOR SERVICES REFLECT THE ALLOCATION OF RISK BETWEEN THE PARTIES AND THAT THE PARTIES WOULD NOT ENTER INTO THIS LETTER AGREEMENT WITHOUT THIS LIMITATION ON ITS LIABILITY. IF ANY PART OF THIS SECTION 7.0 IS UNENFORCEABLE UNDER APPLICABLE LAW, THEN EITHER PARTY'S LIABILITY WITH RESPECT TO SUCH UNENFORCEABLE TERM WILL BE THE MINIMUM PERMITTED BY SUCH APPLICABLE LAW. THE LIMITATIONS OF LIABILITY SET FORTH IN THIS SECTION 7 SHALL NOT APPLY WITH RESPECT TO THE PARTIES' INDEMNITY OBLIGATIONS UNDER SECTION 14 BELOW.

8. Term of this Letter Agreement
    The term of this Letter Agreement is twelve (12) months including the prestart period (the "Term"). After month 4 of the engagement, either party may

2

cancel the balance of this Letter Agreement by providing fifteen days written notice to the other.

9. Nature of the Relationship

The relationship between PHARMATECH and CMP shall be that of independent contractors that have agreed to participate jointly in the marketing activities set forth herein. Both PHARMATECH and CMP acknowledge that no partnership, joint venture, distributorship, agency, franchise or other relationship is created by this Letter Agreement and both parties agree not to make any representation to the contrary to prospects, customers, the press or any other person or entity. Neither party shall have any right to enter into any contracts or binding commitments or to make any representations or warranties not otherwise authorized herein in the name or on behalf of the other. CMP further agrees not to make any representations about features, specifications or capabilities of PHARMATECH's products or services which are inconsistent with or in addition to those representations made expressly by PHARMATECH in its own marketing materials.

10. **Severability.**

If any term or provision of this Letter Agreement is found to be invalid, illegal or unenforceable, it shall be construed or modified so as to be valid, legal and enforceable if possible, as consistent with the parties' intent. The validity, legality or enforceability of the remaining terms and provisions will not in any way be affected or impaired thereby.

11. The Kick-off meeting

CMP and PHARMATECH will have a full day kick-off meeting in accordance with the kick-off agenda described in the SOW. The scheduling and location of the kick off meeting will be mutually agreed upon after this Letter Agreement is approved.

12. Venue

This Letter Agreement shall be governed by Colorado law.

13. Attorney's Fees

PHARMATECH and CMP are responsible for their own attorney fees should suit be brought to enforce or interpret any part of this Letter Agreement.

14. Indemnity

Each party (the "Indemnifying Party") shall indemnify and hold harmless the other party, its owners, officers, directors, agents, and employees (the "Indemnified Party"), from and against All Third Party claims, losses, liabilities or costs, including attorney's fees and court costs, (collectively "Claims") arising out of (a) the acts or

3

omissions of the Indemnifying Party and its personnel and (b) the breach of any obligation under this Letter Agreement by the Indemnifying Party.

15. Amendment

This Letter Agreement may only be modified by a written agreement mutually agreed to and executed by the parties.

After receiving your approval of this Letter Agreement CMP will start this engagement by scheduling the kick-off meeting with PHARMATECH.

Agreed to by:

Channel Methods Partners, LLC

*[signature]*

David Hirschfeld, Senior Partner

Date: 5/30/2013

Agreed to by:

PHARMATECH, INC.

*[signature]*

Rob Bohacs, CEO

Date: May 30 2013

*200 Atlantic Avenue, Manasquan, New Jersey, 08736, phone 732-292-4777*

4

# Channel Methods, LLC
*Outsourced business development for emerging technology companies*

*Qualified pipeline creation*  *Outsourced sales management*
*Outsourced sales teams*  *Branding and messaging campaigns*

---

Statement of Work for Pharmatech (PTO), May __, 2013

This *Exhibit A Statement of Work* is an attachment to the Letter Agreement (the "Letter Agreement"), dated- May 30 __, 2013, between Pharmatech, Inc. (PTO) and Channel Methods Partners (CMP). The terms and conditions set forth in the Letter Agreement will be applicable to the Services authorized hereunder, unless otherwise specifically set forth herein. All terms used herein shall have the definitions set forth in the Letter Agreement, unless otherwise defined herein. For purposes of this *Statement of Work*, PTO CMP agree as follows:

A. Scope of Work:

- Engage for twelve (12) months locating and qualifying opportunities within the targeted services, targeted markets and qualification standard as follows:
- Specifically, locate and qualify a minimum of 13-16 Full Service CRO opportunities. This works out to an average target of 4 Full Service opportunities each quarter for 4 quarters.
- Transition those opportunities to the PTO Sales Team in such a way as to facilitate their best sales practices.
- Assist the PTO Sales Team in closing business where ever possible
- At the end of Month 3 PTO may cancel the Letter Agreement and this engagement with fifteen (15) days' notice to CMP.

   Targeted services are:

   Full Service CRO services

   Primary Indication is Oncology but can do others

   All Phases 1b to Post Commercial

   Target Sponsors in N.A. Can do Global Trials

   Targeted markets are:

   Primarily located in N.A.

   Small & Virtual Biotech Sponsors

   Small & Mid-size Pharma and Biotech Sponsors

   Oncology Trials primarily but others as they come up

   Phase 1b thru 4

1

Global Trials

Qualification standards are:

    Receive a valid RFP or Concept Protocol for bid as determined by PTO.

B. <u>Compensation</u>:

- For the kick-off meeting and pre-start preparation there is a one-time cost as follows. Payment for this phase is due in advance of the kick off meeting.

| Resource | Daily Rate | No of Days prior to start |
|---|---|---|
| Sr. Marketing Consultant | $900 | 1.50 |
| Sales Project Manager | $475 | 2.00 |
| Inside Sales | $395 | 2.00 |
| Research Person | $220 | 1.00 |
| DB Manager | $200 | 1.00 |
| Total one time start up fee | | $3,510 |

- For on-going Business Development services there is a monthly fee covering all of the costs associated with this effort (the "Business Development Fees"). The Business Development Fees will be due monthly upon receipt by PTO of an invoice and shall entitle PTO to the resources set forth below for the indicated number of days/week:

| Resource | Daily Rate | Days /week Month 1-12 |
|---|---|---|
| Sales Project Manager | $475 | 0.50 |
| Senior Inside Sales Person | $395 | 3.00 |
| Research Person | $220 | 0.25 |

2

| DB Manager | $200 | 0.25 |
|---|---|---|
| Total Monthly Retainer Cost | | $6,568 |

* Incentive compensation will be earned and paid as follows:

1. A Lead Fee of $300 for each qualified opportunity accepted by PTO during the Term, which consists of PTO either (1) taking ownership at any time after meeting with the prospect; or (2) submitting a proposal to the prospect. Lead Fees will be invoiced upon notification of Lead acceptance and will be paid within thirty days of Invoice Date.
2. Commission:
CMP will be eligible to receive a commission as detailed below, for any Full Service CRO or SMO opportunity that results in the award of business to PTO during the Term of the Letter Agreement or for a period of twelve (12) months after termination of the Letter Agreement, as evidenced by an executed written contract (the "Study Contract") between the Customer and PTO ("Commissionable Order"). PTO will pay a monthly commission to CMP which shall be a percentage of the Booked Value of the Commissionable Order, which is defined as the total fee to be paid to PTO by its customer as agreed to in the Study Contract between the parties. PTO will issue to CMP a monthly commission report including the following columns:
Date Booked, Customer name, Amount booked, Invoiced to date, received to date, commission due CMP, Commission paid to date, commission due this month. CMP will invoice PTO for the commissions due for the current month and the invoice will be due thirty days from the invoice date.
. Pass through costs will not be eligible for commissions.

Change orders and upgrades to a Commissionable Order which are made within 1 year of execution of the Commissionable Order will be subject to commissions.

Additional trials booked with a Channel Methods customer a customer already on the monthly commission report, within 1 year of PTO executing their original Commissionable Order will be subject to commissions.

Commissions will be reported on a monthly commission statement.
Commission percentages will be as follows:

    a. 2% of any booked CRO Commissionable Order up to $1,400,000 in Booked Value
    b. 2.5% of any booked CRO Commissionable Order over $1,400,000 in Booked Value
    c. 2% of any booked SMO Commissionable Order up to $450,000 in Booked Value

3

      d. 2.5% of any booked SMO Commissionable Order over $450,000 in Booked Value

C. **Deliverables**:

- CMP and PTO will conduct a one-day Kick-Off meeting for the purposes of transferring information and setting up supporting infrastructure. The agenda for this meeting will be as follows:
    - Brief PTO company overview, history & organization
    - Presentation of PTO services, capabilities and unique benefits
    - Review of existing customers, solutions and success stories around ROI
    - Demographic profiles of target customers and roles (Top target accounts provided by PTO)
    - Marketing plans for 2013/2014 – any planned events we can capitalize on or assist with
    - Value Propositions, Messaging & Sales Tools
    - Competitive Positioning
    - Confirmation of Qualification criteria
    - Ball park pricing
    - Review of Sales and Turnover process
    - Do Not Call List
    - Infrastructure issues

- CMP will execute approximately 2-3 weeks of pre-start work consisting of the following items:

    - Maximize benefits of the pre-start preparations
    - Refine and clarify definitions of targeted services
    - Finalize messaging, email content, reporting and metrics
    - Evaluate markets and identify target companies and opportunities
    - Set up PTO database with appropriate metrics and reporting
    - Select and train team members-see team slide
    - Establish infrastructure (email, phone, IM, calendars, contacts, do not call list)
    - Produce the CMP Internal Training & Reference Guide for PTO.
    - Obtain PTO approvals on all of above
    - Implement Soft Start, review calls and make messaging adjustments

- CMP will execute an Inside Sales campaign utilizing all commercially reasonable efforts, for each of the months of this engagement. Such campaign shall consist of the following activities:

    - Line up target accounts
    - Inside sales
    - Qualification
    - Opportunity transition to PTO

4

- Support PTO resources in closing business where applicable
- Strategize specific accounts on a daily basis or as needed

* CMP will conduct weekly sales meetings with PTO and analyze reports & metrics, calls made, specific opportunities and pipeline. Make adjustments to program as required

* CMP will provide PTO with Opportunity Turnover Reports as follows:
  - Qualifications have been met
  - Schedule Teleconference, Webinar, or Face to Face meeting
  - Agenda agreed to by all parties
  - Attendees identified
  - Provide PTO with pre-meeting Turnover Report
    - Summary information about the Prospect Company
    - Project description and scope, timing and approximate size
    - Discovery questionnaire if applicable
    - Chronological notes from all contacts made with the Prospect Company
    - Prospect attendees to the meeting & their biographies & work histories
    - Focus and Agenda for the meeting
    - Action Items & Status (Example: Send or receive executed CDA)
* Inside Sales Person Kicks-off the meeting

This Statement of Work is approved by:

Pharmatech, Inc.

Name: Rob BeLaus

Title: CEO

Signature: [signature]

Date: May 30 2013

Channel Methods Partners, LLC.

Name: David Hirschfeld

Title: Sr Partner

Signature: [signature]

Date: 5/30/2013

5





Pharmatech, Inc.
789 Sherman St, Suite 310
Denver, CO 80203
720-917-7465

April 7, 2014

David Hirschfeld
Senior Partner
Channel Methods Partners, LLC
1913 Atlantic Ave
Suite R-5
Manasquan, NJ 08736

Dear David:

In accordance with section 9 of our agreement and due to dismal performance and zero ROI, Pharmatech wishes to terminate our current agreement with Channel Methods Partners, LLC effective immediately.

Thank you,

Rob Bohacs
CEO
Pharmatech, Inc.